| | |
|---|---|
| Abdi Awnuh, | File No. 19-cv-2765 (ECT/TNL) |
| Plaintiff, | |
| v. | |
| Public Housing Agency of the City of Saint Paul, | **OPINION AND ORDER** |
| Defendant. | |

Kristin J. Holmes, Southern Minnesota Regional Legal Services, St. Paul, MN for Plaintiff Abdi Awnuh.

K. Meghan Kisch, Office of the St. Paul City Attorney, St. Paul, MN for Defendant Public Housing Agency of the City of Saint Paul.

Plaintiff Abdi Awnuh seeks a preliminary injunction requiring Defendant Public Housing Agency of the City of Saint Paul ("the PHA") to reinstate rental assistance payments on his behalf under the federally-funded Section 8 housing choice voucher program. Awnuh received these benefits for roughly ten years before the PHA terminated them in April 2019. Awnuh alleges that the termination of his benefits violated the federal Fair Housing Act and the Fourteenth Amendment's Due Process Clause because it occurred without adequate access to language interpretation services, without proper notice, and without the opportunity for a pre-termination hearing. Awnuh's motion will be denied because he is not likely to prevail on the merits of his claims and the remaining

factors the law requires to be considered do not so strongly favor Awnuh that they make up for that deficiency.

I

The Section 8 housing choice voucher program is funded by the United States Department of Housing and Urban Development ("HUD") and provides subsidies to qualified low-income families to assist with their monthly rental payments. *See generally* 42 U.S.C. 1437f. The purpose of the program is to "aid[] low-income families in obtaining a decent place to live" and to "promot[e] economically mixed housing[.]" 42 U.S.C.§ 1437f(a). The PHA administers the Section 8 program locally to families in St. Paul by evaluating applicants under federally-mandated eligibility criteria and issuing housing vouchers to approved participants. Mitchell Aff., ¶¶ 3–4 [ECF No. 16]; *see* 42 U.S.C. § 1437f(b)(1). Once voucher recipients obtain housing through a landlord who participates in the program, the monthly rental cost is allocated between the family and the PHA based on the family's income, and the PHA makes payments directly to the landlord on behalf of the family. Mitchell Aff. ¶ 4; *see* 42 U.S.C. § 1437f(o). Section 8 program participants are required to comply with "family obligations," which include an annual redetermination of eligibility and timely reporting of changes in income. *See* 24 C.F.R. § 982.551. The PHA may terminate a family's participation in the program if any of the family obligations are violated or if a family owes rent or other amounts to the PHA in connection with Section 8 assistance. 24 C.F.R. § 982.552(c). If the PHA determines that there are grounds for termination, it sends a written notice of termination containing "a brief statement of reasons for the decision" and informing the family of the

2

right to request an informal hearing to contest the termination decision and the deadline for requesting a hearing. 24 C.F.R. § 982.555(a)(1)(iv), (a)(2), (c)(2). When the PHA decides to terminate a family's participation in the program because of the family's action or failure to act, *see* 24 C.F.R. § 982.552, the PHA must give the participating family an opportunity for an informal hearing before the PHA terminates housing assistance payments to consider whether the decision was made in accordance with the law, HUD regulations, and PHA policies. 24 C.F.R. § 982.555(a)(1)(iv), (2). The PHA gives participants ten working days from the date of termination to request a hearing. *See* Mitchell Aff., Ex. M [ECF No. 18 at 19]. If the family's participation in the program is terminated, the housing voucher is reassigned to another eligible family. *See id.* ¶ 24. The PHA maintains a waitlist of applicants seeking rental assistance, and there are approximately 3,000 applicants on the current waitlist. *Id.* ¶ 5. HUD has allocated 4,708 housing vouchers to the PHA, but the PHA currently administers 4,844 housing vouchers such that all available housing subsidies are in use. *Id.* at ¶¶ 5–6; Mem. in Opp'n at 4 [ECF No. 15].

Awnuh is a Somali immigrant "who speaks limited English and cannot read or write effectively in any language" and the single parent to three teenage children. Mem. in Supp. at 2 [ECF No. 8]. Awnuh's family received rental assistance through the Section 8 housing choice voucher program from 2009 until April 30, 2019, when the PHA terminated their benefits. *Id.* The events leading to the termination began in summer 2018 when Awnuh failed to report a change in his income within ten days of the change, as required by the PHA. *See* Mitchell Aff., Ex. A at ¶ 3 [ECF No. 18 at 1–2]. On September 4, 2018, Awnuh submitted a Section 8 Change Request form to notify the PHA of an increase in his income

based on employment he began on July 23.  *Id.*, Exs. B, C [ECF No. 18 at 3–4].  On September 26, Awnuh's Section 8 caseworker, Jean Hausladen, informed Awnuh by letter that he owed the PHA $1,198, the amount the PHA had overpaid in rental assistance for the months of September and October 2018.  *Id.*, Ex. D [ECF No. 18 at 5–8].  The letter noted that Awnuh's previous monthly obligation of $200 should have increased to $799 on September 1.  *Id.*  The letter told Awnuh that he could pay this amount in full, return an enclosed payment agreement, or contest the PHA's calculation of the overpayment by submitting a written request for an informal hearing within ten working days.  *Id.*  The letter warned Awnuh that, if he did not pay the balance within 30 days or establish a payment plan, his assistance could be terminated.  *Id.*  The PHA's standard "interpreter insert" was enclosed with the letter, which translated the following statement into Somali: "This information is important.  If you do not understand it, please call your PHA representative, for free language assistance."  *Id.*

Awnuh did not respond to the letter, but on October 23, he submitted another Section 8 Change Request form.  Mem. in Opp'n at 6; Mitchell Aff., Ex. E [ECF No. 18 at 9].  The form Awnuh submitted contained a note in English indicating that Awnuh had been fired from his job and needed additional rental assistance while he searched for new employment.  Mitchell Aff., Ex. E.  Awnuh signed the form, but it is not clear whether he or someone else wrote the information provided on the form.[1]  *Id.*  On October 30, Awnuh

---

[1]      Awnuh's counsel represents that his name, social security number, and phone number are "most of the information that [he] is able to write in English."  Mem. in Supp. at 4.  At the hearing on this motion, Awnuh's counsel stated that information on the Section 8 Change Request forms generally was written by someone else on Awnuh's behalf.  But

filed another Section 8 Change Request Form that included the following statement: "I am not working. Please can you help me. This is Abdi Awnuh." Mitchell Aff., Ex. G [ECF No. 18 at 11]. Attached to this form was a wage statement from Awnuh's previous employer. *Id.* That same day, in response, Hausladen sent Awnuh a letter asking him to submit verification from his previous employer showing his last day of work. *Id.*, Ex. F [ECF No. 18 at 10]. Hausladen's letter does not indicate whether it was accompanied by an interpreter insert. There is nothing in record suggesting that Awnuh responded to Hausladen's letter.

On January 22, 2019, the PHA sent Awnuh a notice regarding his annual eligibility redetermination appointment scheduled for February 12. *Id.*, Ex. H [ECF No. 18 at 13]. The letter stated, "If you are in need of an interpreter, please complete and return the attached form so arrangements can be made to have an interpreter available for you at our meeting." *Id.* The attached interpreter request form was written primarily in English. *Id.*, Ex. I [ECF No. 18 at 14]. The only information written in Somali stated, "Notice! If you cannot read English, please ask your PHA contact person to provide an interpreter." *Id.* Awnuh previously requested an interpreter using this form for his 2017 and 2018 recertification appointments, though he did not request an interpreter in 2016. *See id.*, Exs. J, K [ECF No. 18 at 15-17]; Mem. in Opp'n at 7.

Awnuh did not request an interpreter for the February 12 appointment but instead brought his adult daughter, who speaks English, to act as an informal interpreter.

_____

no record evidence establishes who assisted Awnuh with providing the information on these forms.

Hausladen Aff. ¶ 4 [ECF No. 17]. Awnuh's daughter has a mental health disability for which she receives SSI benefits, though the nature of this disability is not described in the record. Mem. in Supp. at 3. In an affidavit submitted in response to Awnuh's motion, Hausladen testifies that she "did not find it remarkable that Mr. Awnuh did not request an interpreter, but instead chose to use his English-speaking daughter to provide language clarification services if the need arose." Hausladen Aff. ¶ 6. She further states that, "based on [her] past experiences and Mr. Awnuh's demonstrated ability to speak some English, [she] felt comfortable holding the meeting without an unrelated Somali-speaking interpreter." *Id.* ¶ 7. During the meeting, Hausladen reviewed the recertification forms with Awnuh and his daughter "without difficulty" and Awnuh's daughter relayed information to him in Somali when necessary. *Id.* ¶ 8.

The recertification forms list numerous family obligations. Mitchell Aff., Ex. A. Relevant to this case, Section 8 participants are required to verify that they understand that "the family is required to report to the PHA in writing within ten (10) days any changes in income and expenses" and that "housing assistance can be terminated for failing to promptly repay the PHA monies owed." *Id.* ¶¶ 3, 16. The form directs participants to read and initial each obligation individually, which Awnuh did not do (though he did do this on his 2018 recertification form). *Id.*, *generally*. At the bottom of the form participants must certify, "I have read each obligation and understand all of the above information." *Id.* Awnuh signed and dated the form. *Id.* He also completed other paperwork at the meeting. Compl., Ex. 6 [ECF No. 1-1].

On February 14, Hausladen sent Awnuh a letter informing him that the PHA was unable to process his recertification due to his outstanding debt owed to the PHA. Mitchell Aff., Ex. L [ECF No. 18 at 18]. The letter also informed Awnuh that if he did not pay the $1,198 by March 15, his rental assistance would be terminated. *Id.* The record does not indicate whether an interpreter insert was enclosed with the letter. Awnuh did not make any payments. Mem. in Opp'n at 9.

On March 21, Hausladen sent a letter to Awnuh informing him that his rental assistance would be terminated as of April 30, 2019, based on his failure to pay the balance owed and his failure to report income changes within ten days. Mitchell Aff., Ex. M [ECF No. 18 at 19–20]. The letter also informed Awnuh that he could contest the termination by submitting a written request for an informal hearing within ten working days of the date of the letter. *Id.* An interpreter insert was attached to the letter. *Id.* Hausladen also sent a written notification of the impending termination to Awnuh's landlord. *Id.*, Ex. N [ECF No. 18 at 21].

On March 29, Awnuh submitted a Section 8 Change Request form to which he attached a statement from his landlord showing an amount owed but provided no additional information and made no requests. *Id.*, Ex. O [ECF No. 18 at 22–23]. Three days later, Awnuh's teenage son submitted another Section 8 Change Request form and attached money order stubs dated March 1, 2019, totaling $1,200, but again Awnuh provided no additional information and did not make any requests. *Id.*, Ex. P [ECF No. 18 at 24–26]; Mem. in Supp. at 4.

The ten-day period within which to request a hearing expired on April 4. On that day, Hausladen sent Awnuh a letter inquiring about his purpose for submitting the statement from his landlord. *Id.*, Ex. Q [ECF No. 18 at 27]. Hausladen attached documents showing the PHA's September 2018 rent adjustment and Awnuh's outstanding balance as well as an interpreter insert. *Id.* On April 9, Hausladen left a voicemail message for Awnuh inquiring about Awnuh's purpose for submitting the money order stubs. *Id.*, Ex. P. There is nothing in the record indicating any further communication occurred between Awnuh and the PHA in April 2019. The PHA terminated Awnuh's participation in the Section 8 program on April 30, and his family's voucher was reassigned to a family on the waiting list. Mitchell Aff. ¶ 24. Awnuh nonetheless reportedly believed that he was still a Section 8 program participant until approximately July 1. Mem in Supp. at 5; Reply Mem. at 4–5 [ECF No. 19]. At the hearing on this motion, Awnuh's counsel stated that Awnuh believed that his outstanding debt of $1,198 had been cured based on his payment of $1,200 to his landlord and his submission of money stubs showing that payment, not realizing that the money was owed to the PHA.

II

Injunctive relief is an "extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). The Eighth Circuit's oft-cited *Dataphase* decision describes the list of considerations that are applied to decide whether to grant preliminary injunctive relief: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would

cause to the other litigants; and (4) the public interest." *Lexis-Nexis v. Beer*, 41 F. Supp. 2d 950, 956 (D. Minn. 1999) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 112–114 (8th Cir. 1981) (en banc)). The core question is whether the equities "so favor[] the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Sys., Inc.*, 640 F.2d at 113. "The burden of establishing the four factors lies with the party seeking injunctive relief." *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018).

## A

"While no single factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citations omitted) (internal quotation marks omitted). Although this factor uses the term "probability," the movant need not show a greater than fifty percent likelihood of success. *Dwyer*, 294 F. Supp. 3d at 807. And the movant "need only show likelihood of success on the merits on a single cause of action, not every action it asserts in its complaint." *Id.* "[T]he absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied[.]" *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009).[2]

---

[2]     The PHA argues that a heightened standard applies to Awnuh's motion because he is requesting a mandatory injunction, *i.e.* one that would require the PHA to take an affirmative action, rather than a prohibitory injunction, *i.e.* one that would prevent the PHA from taking an action. Mem. in Opp'n at 12. In support of its position, the PHA relies on Second Circuit caselaw requiring a movant seeking a mandatory injunction to show "a clear or substantial likelihood of success" on the merits. *See Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 97 (2d Cir. 2005). In response, Awnuh cites Sixth Circuit cases holding that any differences between mandatory and prohibitory injunctions do not warrant

Awnuh first claims a violation of the FHA pursuant to 42 U.S.C. § 3613. *See* 42 U.S.C. § 3601 *et seq.* The FHA makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). A plaintiff alleging discrimination under the FHA may assert a claim based on disparate treatment or disparate impact. *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2522 (2015); *Gallagher v. Magner*, 619 F.3d 823, 831–34 (8th Cir. 2010).

Awnuh seems to allege that the PHA violated § 3604 by discriminating against him because he is Somali. *See* Compl. ¶¶ 57–60 [ECF No. 1]; Mem. in Supp. at 7. He alleges that the PHA discriminated against him by refusing to provide adequate language interpretation services; by sending him a letter in English on the final day that he could have requested a hearing; and by not providing him with a pre-termination hearing based on his communications during the ten-day period for requesting a hearing. Mem. in Supp. at 7. In support of these allegations, Awnuh states that he "cannot read or write effectively in any language and speaks very little English" and that his March 29 and April 1 Section 8 Change Request forms were his "attempts to alert [the PHA] of his request for a hearing"

---

application of a different standard. *See, e.g.*, *United Food & Commercial Workers Union, Local 1099 v. S.W. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998). Because Awnuh cannot establish that he is likely to succeed on the merits under the standard required by *Dataphase*, it is not necessary to consider whether a higher standard might apply to his motion.

and that the money stubs he submitted totaling at least $1,200 were "an attempt to cure the underlying reason for termination." *Id.*; *see* Mitchell Aff., Ex. P.

Disparate-treatment claims under the FHA are analyzed under the same framework as Title VII disparate-treatment claims. *Gallagher*, 619 F.3d at 831. "Proof of discriminatory purpose is crucial for a disparate treatment claim." *Id.* (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977)). Absent direct evidence of discriminatory intent, the burden-shifting test established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies. *See id.* When considering whether indirect evidence creates an inference of discriminatory intent, "discriminatory impact alone is not determinative outside of 'rare' cases where the pattern of discriminatory effect is 'stark.'" *Id.* at 833 (quoting *Vill. of Arlington Heights v. Metro. Dev. Corp.*, 429 U.S. 252, 266 (1977)).

Awnuh is unlikely to succeed on the merits of a disparate-treatment claim because he does not present any direct evidence that the PHA's actions were motivated by discriminatory intent, and it is difficult to infer discriminatory intent from the evidence in the record concerning the PHA's conduct. The record shows that the PHA has adopted a plan to "provide meaningful access to its programs and activities by persons with Limited English Proficiency." Compl., Ex. 1 [ECF No. 1-1]. The plan provides that the PHA will take "reasonable steps" to provide language assistance to clients who have difficulty communicating in English. *Id.* Specifically, the plan states that if a client requests language assistance and the PHA determines such assistance is necessary, the PHA will make "reasonable efforts to provide free language assistance." *Id.* The plan also provides

that the PHA will "weigh the costs and benefits of translating documents" and do so if it determines that translation is "necessary and appropriate." *Id.* With respect to formal interpreters, the plan states that the PHA will provide interpreters "[w]hen necessary to provide meaningful access" and that at "important stages that require one-on-one contact, written translation and verbal interpretation services will be provided" in accordance with a broad, four-factor analysis described on page one of the plan. *Id.*

There is no evidence that the PHA violated this plan in its communications with Awnuh regarding his termination and, in fact, the PHA's actions appear to be consistent with the plan. The PHA included an interpreter insert with the termination notice as well as with the letter written in English that was sent to Awnuh on April 4. Awnuh suggests that the PHA was obligated to affirmatively contact him with an interpreter even though he did not request language interpretation services. Mem. in Supp. at 7; Reply Mem. at 3. But based on Awnuh's prior dealings with the PHA, including his demonstrated ability to request interpreters in the past and to communicate with his caseworker, it would be reasonable for the PHA to determine that it was not necessary to provide additional services unless Awnuh requested them. Awnuh also asserts that the PHA failed to follow the plan by allowing Awnuh's daughter to act as an informal interpreter during his recertification appointment, *see* Reply Mem. at 4, but the plan specifically states that the PHA should accommodate a client's request to use an informal interpreter if possible, *see* Compl., Ex. 1, and this issue does not bear on the adequacy of the language services provided by the PHA with respect to its termination process. Awnuh's complaint also references Executive Order 13166, which compels federal agencies to implement plans that provide meaningful

access to language services for persons with limited English proficiency, *see* Compl. ¶ 26, but the PHA's actions appear to be consistent with that order. Even if Awnuh was able to show that the PHA's actions had a discriminatory effect, he has not alleged any pattern of such an effect that might be sufficient to support an inference that the PHA acted with a discriminatory purpose.

Disparate-impact claims under the FHA are subject to a three-step analysis. *Gallagher*, 619 F.3d at 833. A showing of discriminatory intent is not required. *Id.* First a plaintiff must make a prima facie showing "that the objected-to action result[ed] in, or can be predicted to result in, a disparate impact upon protected classes compared to a relevant population." *Darst–Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.*, 417 F.3d 898, 902 (8th Cir. 2005); *see also Oti Kaga, Inc. v. S.D. Hous. Dev. Auth.*, 342 F.3d 871, 883 (8th Cir. 2003) (stating a plaintiff "must show a facially neutral policy has a significant adverse impact on members of a protected minority group."). If a plaintiff makes a prima facie showing, the burden shifts to the PHA to "demonstrate that its policy or practice had [a] 'manifest relationship' to a legitimate, non discriminatory policy objective and was necessary to the attainment of that objective." *Gallagher*, 619 F.3d at 834 (quoting *Darst–Webbe*, 417 F.3d at 902). If the PHA shows that its actions were justified, the burden shifts back to the plaintiff to show "a viable alternative means was available to achieve the legitimate policy objective without discriminatory effects." *Id.* (quotation omitted).

Awnuh does not allege in his complaint that the PHA's Limited English Proficiency plan and its actions in accordance with that plan had, or will have, a significant adverse impact on persons with limited English proficiency as a group. At the hearing on this

motion, Awnuh's counsel suggested that there would be a disparate impact based on national origin if the PHA's policy is not to follow-up with client communications, but the record does not contain evidence of such a policy or practice. Awnuh does not otherwise challenge the validity of the PHA's policies concerning the provision of language assistance.

Awnuh also asserts a claim pursuant to 42 U.S.C. § 1983 that the PHA violated his due process rights under the Fourteenth Amendment. Due process requires that a recipient of government assistance "have timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally." *Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970). Before welfare benefits can be terminated, a recipient must be afforded a pre-termination hearing, irrespective of whether a constitutionally adequate opportunity for a post-termination hearing exists. *Id.* With respect to the termination of Section 8 assistance, federal regulations provide that the PHA must send the participant family a written notice of termination containing "a brief statement of reasons for the decision" and informing the family of their right to request an informal hearing to contest the termination decision and the deadline for requesting a hearing. 24 C.F.R. § 982.555(a)(1)(iv), (a)(2), (c)2. When the PHA decides to terminate assistance for a participant family because of the family's action or failure to act, *see* 24 C.F.R. § 982.552, the PHA must give the participant family an opportunity for an informal hearing before the PHA terminates housing assistance payments to consider whether the determination was made in accordance with the law, HUD regulations and PHA policies.

24 C.F.R. § 982.555(a)(1)(iv), 2.  In keeping with these requirements, courts in this district and others have consistently held that due process is satisfied when a housing authority provides notice of the legal and factual basis for termination and allows the recipient an opportunity to respond.  *See Jones v. Pub. Hous. Agency of City of Saint Paul*, No. 17-5448 (MJD/DTS), 2018 WL 5084842, at *2 (D. Minn. Oct. 18, 2018); *Brawner v. Pasco Cty. Hous. Auth.*, No. 8:14-cv-01616-SDM-AEP, 2014 WL 5093993, at *3 (M.D. Fla. Oct. 9, 2014); *Jones v. Lansing Hous. Comm'n*, No. 5:03-cv-123, 2003 WL 26118817, at *6 (W.D. Mich. Sept. 19, 2003).

In his complaint, Awnuh alleges that the PHA violated his due process rights by terminating his voucher assistance "without affording him proper notice of its decision or any opportunity for a pre-termination hearing."  Compl. ¶¶ 61–69.  As part of this allegation, he claims that the PHA did not timely consider or respond to his March 29 and April 1 communications, which he characterizes as attempts to request a hearing.  The record shows that the PHA sent Awnuh a written notice on March 21, 2019, that his rental assistance would be terminated on April 30.  Mitchell Aff., Ex. M.  The notice explained the grounds for termination and informed Awnuh that he could contest the termination by submitting a written request for an informal pre-termination hearing within ten working days of the date of the letter.  *Id.*  Although the notice itself was not translated, an interpreter insert was attached to the letter.  *Id.*  Though Awnuh submitted two Section 8 Change Request forms during the ten-day period in which he could request a hearing, Awnuh did not request language interpretation services or a pre-termination hearing via these forms or otherwise.  *Id.*, Exs. O, P.  While it is true that the PHA did not respond to the forms until

the last day on which Awnuh could request a hearing, Awnuh did not respond to the PHA's attempts to contact him about the purpose of those submissions.

Awnuh is unlikely to succeed on the merits of his due process claim because the record supports a finding that the PHA complied with its due process obligations. Although the PHA's compliance with federal regulations is not necessarily dispositive as to whether the PHA satisfied its constitutional due process obligations, the PHA's written notice, which afforded Awnuh the opportunity for a pre-termination hearing, also appears to comport with the due process requirements for welfare recipients established in *Goldberg*. Awnuh argues that his due process rights were nonetheless violated because the notice and opportunity to request a hearing were not proper in that he was not provided with meaningful access to language services and because the PHA should have interpreted his March 29 and April 1 submissions as the exercise of his right to request a hearing. But Awnuh does not provide any authority that the PHA was constitutionally required to clarify the nature of his communications or to provide interpretation or translation services absent a request from Awnuh.[3]

---

[3] It seems worth noting that even if Awnuh was likely to succeed on the merits of his legal claims in this case, he would be unlikely to ultimately prevail in contesting his termination before the PHA. The focus of such a hearing would be on whether there was a proper basis for his termination and, possibly, whether Awnuh understood his obligations as a participant in the Section 8 program. The PHA's proffered reasons for termination are enumerated in the federal regulations and supported by evidence in the record, including evidence demonstrating that Awnuh was aware of the PHA's calculation of its overpayment billed to him and elected not to challenge it.

B

The second *Dataphase* factor to consider is the threat of irreparable harm in the absence of relief. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). The harm must be "*likely* in the absence of an injunction," *Winter*, 555 U.S. at 22, "great and of such imminence that there is a clear and present need for equitable relief," *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996). A plaintiff must show more than a future risk of irreparable harm; "[t]here must be a clear showing of immediate irreparable injury." *Berkley Risk Adm'rs Co., LLC v. Accident Fund Holdings, Inc.*, No. 16-2671 (DSD/KMM), 2016 WL 4472943, at *4 (D. Minn. Aug. 24, 2016) (citation omitted) (internal quotation marks omitted). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins Inc.*, 346 F.3d at 844; *see also Gamble v. Minn. State Indus.*, No. 16-cv-2720-JRT-KMM, 2017 WL 6611570, at *2 (D. Minn. Dec. 1, 2017) (collecting cases).

Awnuh argues that he will be irreparably harmed if his rental assistance is not reinstated because he will not be able to pay rent and utilities or meet other basic needs. Mem. in Supp. at 10. He states that his family "faces a realistic and imminent prospect of eviction and homelessness in the coming weeks." *Id.* Awnuh also notes that being forced to move from the apartment where his family has lived for 14 years would be detrimental to his children's stability, especially to his daughter who has emotional and behavioral disabilities. *Id.* at 11; Compl. ¶ 5. The PHA questions the imminence of any irreparable

harm to Awnuh and his family given his seeming ability to meet his family's needs over the last six months despite no longer receiving rental assistance. Mem. in Opp'n at 14–15. In the time since his participation in the Section 8 program was terminated, Awnuh has worked intermittently. Reply Mem. at 6. He has been able to pay rent with that income as well his daughter's SSI benefits, assistance from the Minnesota Family Investment Program, and money from family members. Mem. in Supp. at 10. Awnuh has also received emergency rental assistance through Ramsey County, which is available only once per calendar year. *Id.* However, Awnuh states that "the total amount of this assistance is less than market rate rent" for his apartment, and he asserts that his family is no longer able to assist him financially due to their own financial obligations. *Id.*; Reply Mem. at 6. He further states that other self-help measures, such as accepting a roommate or negotiating with his landlord, are not feasible. Reply Mem. at 6. Awnuh also notes that the termination of his participation in the Section 8 program will likely cause him to be ineligible for other subsidized housing programs. Mem. in Supp. at 10.

The loss of rental assistance raises a risk of irreparable harm. *See Perkins v. Metro. Council, Metro HRA*, 21 F. Supp. 3d 1006, 1011 (D. Minn. 2014) (finding homelessness is "sufficient to demonstrate irreparable harm"). Additionally, under the circumstances presented here, a delay in seeking injunctive relief does not necessarily undermine Awnuh's claim of irreparable harm. *Jones v. Pub. Hous. Agency of the City of Saint Paul*, No. 17-cv-5448 (MJD/DTS), 2018 WL 3104269, at *2 (D. Minn. Feb. 27, 2018), *report and recommendation adopted*, 2018 WL 1535935 (D. Minn. Mar. 29, 2018) (stating delay in seeking injunctive relief related to Section 8 assistance reflected changed circumstance

of loss of employment rather than a lack of urgency on plaintiff's part). Regardless, Awnuh's showing of the likelihood of irreparable harm is not strong. There is no dispute that he faces significant challenges to his ability to pay for housing. But several important questions are not answered. For example, Awnuh does not identify the difference between the cost of his rent and his present or anticipated income, nor does he say whether he is actively seeking employment or other financial resources as he has done in the past. Though Awnuh reports receiving at least one eviction notice from his landlord in the past, the record does not contain specific evidence concerning the imminence of eviction at this time. No doubt a risk of homelessness poses a threat of irreparable harm. But the record is not sufficient to permit a precise assessment of that risk to Awnuh here. Under these circumstances, the threat of irreparable harm Awnuh has identified is outweighed considerably by the likelihood that he will not prevail on the merits of his claims.

## C

The two remaining *Dataphase* factors do not favor either party. The balance-of-harms factor involves "assess[ing] the harm the movant would suffer absent an injunction, as well as the harm other interested parties and the public would experience if the injunction issued." *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 875 (D. Minn. 2015). The issuance of an injunction would hold adverse consequences for the PHA. Evidence in the record shows that it is operating the Section 8 program at or above capacity, and the PHA points out that Awnuh's request is "effectively a request for the PHA to take back a voucher that has since been given to another participant in the Program" because the Section 8 program's resources are being fully utilized. Mem. in Opp'n at 20. In addition to these

concerns, and in view of the merits of Awnuh's claims, the PHA also argues that reinstatement of Awnuh's rental assistance would undermine the fair and efficient administration of the Section 8 program. *Id.* The PHA emphasizes the importance of finality and firm hearing deadlines to assisting families on its waitlist. *Id.*; *see Perkins*, 21 F. Supp. 3d at 1012. Awnuh argues that the PHA will "incur little, if any, additional financial or administrative burden in restoring or continuing" his assistance pending resolution of his legal claims and describes reinstatement as an "inconvenience." Mem. in Supp. at 11. But he cites no authority for this and other similar assertions questioning the potential harm the issuance of an injunction might hold for the PHA.

The public interest is similarly neutral. Both parties identify valid concerns. Awnuh argues that the purpose of the Section 8 program and the existence of many other federal housing programs indicate that the public has a strong interest in preventing homelessness for low-income families. Mem. in Supp. at 12; 42 U.S.C. § 1437f(a). He also contends that the public has an interest in ensuring that Section 8 recipients are afforded procedural due process before termination. Mem. in Supp. at 12. The PHA seems not to challenge these assertions but emphasizes that the establishment of hearing deadlines is integral to the PHA's compliance with federal regulations, which also serves the public interest. Mem. in Opp'n at 21. The PHA also argues that finality in PHA decisions serves the public interest in efficient administration of the Section 8 program because the demand for assistance is greater than the number of available vouchers. *Id.* at 21–22. The PHA contends that denying Awnuh's motion would best serve the public interest in maximizing the number of people who are provided affordable housing. *Id.* at 22. If either party has

the upper hand with respect to this issue, it is the PHA because Awnuh's contention that the public has an interest in procedural due process assumes he did not receive that here, but the law and facts show otherwise.

*

Awnuh is not likely to prevail on the merits of his claims, and the remaining *Dataphase* factors do not weigh sufficiently in his favor to justify issuance of a preliminary injunction. Awnuh's motion must, therefore, be denied.

## ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED THAT** Plaintiff Abdi Awnuh's Motion for Emergency Injunctive Relief [ECF No. 7] is **DENIED**.

## LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  December 3, 2019                     s/ Eric C. Tostrud
                                                               Eric C. Tostrud
                                                               United States District Court