UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Abdi Awnuh,

    Plaintiff,

v.

Public Housing Agency of the
City of Saint Paul,

    Defendant.

File No. 19-cv-2765 (ECT/TNL)

**OPINION AND ORDER**

---

Kristin J. Holmes, Southern Minnesota Regional Legal Services, St. Paul, MN for Plaintiff Abdi Awnuh.

K. Meghan Kisch, Office of the St. Paul City Attorney, St. Paul, MN for Defendant Public Housing Agency of the City of Saint Paul.

---

Defendant Public Housing Agency of the City of Saint Paul ("the PHA") moves for summary judgment and to exclude the expert testimony proffered by Plaintiff Abdi Awnuh in this case challenging the PHA's decision to terminate Awnuh's Section 8 rental assistance payments. The PHA's motion for summary judgment will be granted because there are no genuine issues of material fact remaining for resolution on Awnuh's claims and the PHA is entitled to judgment as a matter of law.

I

Awnuh is a Somali immigrant whose proficiency in the English language is limited. Compl. ¶ 3 [ECF No. 1]; Mem. in Opp'n at 1 [ECF No. 42]. He is a single parent of three teenaged children. Compl. ¶ 2. Awnuh and his family received federal Section 8 rental

assistance from the PHA from 2009 until April 30, 2019. Mem. in Opp'n at 1; Compl. ¶¶ 29, 49. The PHA terminated the family's Section 8 benefits because Awnuh failed to report income he earned in the summer of 2018 that reduced his monthly benefit eligibility. Compl. ¶ 37.

The PHA requires Section 8 recipients to report a change in income within ten days of the change. *See* Mitchell Aff., Ex. A at ¶ 3 [ECF No. 18 at 1–2]. Awnuh submitted a Change Request form on September 4, 2018, that claimed an increase in his income based on employment he began on July 23. *Id.*, Ex. B [ECF No. 18 at 3]. In a letter dated September 26, 2018, Awnuh's Section 8 caseworker, Jean Hausladen, informed Awnuh that he owed the PHA $1,198, the amount it had overpaid in rental assistance for September and October 2018. *Id.*, Ex. D [ECF No. 18 at 5–8]. The letter stated that Awnuh could pay this amount in full, execute a payment agreement requiring monthly payments, or contest the overpayment by submitting a written request for an informal hearing within ten working days. *Id.* The letter warned that if Awnuh did not pay the balance within 30 days or establish a payment plan, his rental assistance could be terminated. *Id.* The PHA enclosed its standard "interpreter insert" with the letter, which translated the following statement into Somali: "This information is important. If you do not understand it, please call your PHA representative, for free language assistance." *Id.*

Awnuh did not respond to the letter, but on October 23, he submitted another Section 8 Change Request form. Mitchell Aff., Ex. E [ECF No. 18 at 9]. The form Awnuh submitted contained a note in English indicating that Awnuh had been fired from his job and needed additional rental assistance while he searched for new employment. *Id.* Awnuh

2

signed the form, but it is not clear whether he or someone else wrote the information provided on the form. *Id.* On October 30, Awnuh filed another Section 8 Change Request Form that included the following statement: "I am not working. Please can you help me. This is Abdi Awnuh." Mitchell Aff., Ex. G [ECF No. 18 at 11]. Attached to this form was a wage statement from Awnuh's previous employer. *Id.* That same day, in response to Awnuh's October 23 letter, Hausladen sent Awnuh a letter asking him to submit verification from his previous employer showing his last day of work. *Id.*, Ex. F [ECF No. 18 at 10]. Hausladen's letter does not indicate whether it was accompanied by an interpreter insert. There is no evidence in the record of Awnuh's response to Hausladen's letter.

On January 22, 2019, the PHA notified Awnuh of his annual eligibility redetermination appointment scheduled for February 12. *Id.*, Ex. H [ECF No. 18 at 13]. The letter stated, "If you are in need of an interpreter, please complete and return the attached form so arrangements can be made to have an interpreter available for you at our meeting." *Id.* The attached interpreter request form was written primarily in English. *Id.*, Ex. I [ECF No. 18 at 14]. The only information written in Somali stated, "Notice! If you cannot read English, please ask your PHA contact person to provide an interpreter." *Id.* Awnuh had requested an interpreter using this form for his 2017 and 2018 recertification appointments, though he did not request an interpreter in 2016. *See id.*, Exs. J, K [ECF No. 18 at 15–17].

The PHA has adopted a plan for Section 8 applicants with limited proficiency in English (the "LEP policy"). ECF. No. 21 at 11–12. This plan requires the PHA to take

3

"reasonable steps" and make "reasonable efforts to provide free language assistance." Compl., Ex. 1 [ECF No. 1-1 at 1–5]. These "reasonable efforts" include providing professional interpreters "[w]hen necessary to provide meaningful access." *Id.* Awnuh did not request an interpreter for the February 12, 2019 recertification appointment but instead brought his English-speaking adult daughter to act as an informal interpreter. Hausladen Aff. ¶ 4 [ECF No. 17]. Awnuh now argues that his daughter is mentally disabled and was therefore not qualified to act as an interpreter. He notes that, in 2016, when his daughter was in the tenth grade, she scored in the lowest one percent of Minnesota students for reading comprehension on the Minnesota Comprehensive Assessment tests. Holmes Aff., Ex. C [ECF No. 43-1 at 53]. Her Individual Education Plan ("IEP") from 2013, when she was in the sixth grade, states that she then read at a second-grade level. Holmes Aff., Ex. D [ECF No. 43-1 at 56]. The IEP also notes that she then had behavioral issues, could be "volatile" and "disruptive," and that she "demonstrate[d] severely aggressive and impulsive behaviors." *Id.* [ECF No. 43-1 at 56–57]. There is no mental-health diagnosis in the record, however. In his summary-judgment brief, Awnuh also states that his daughter takes anti-seizure and anti-psychotic medication but cites only to Awnuh's answers to interrogatories as evidence of these prescriptions. Mem. in Opp'n at 4 (citing Kisch, Aff. Ex. B at 11 [ECF No. 40-1]).

Awnuh argues that the PHA knew that his daughter received SSI benefits, "as this was noted as a source of income for the household at some point during their participation in the [public housing] program." Mem. in Opp'n at 4 (citing Compl., Ex. 6 [ECF No. 1-1 at 11]). This exhibit is Awnuh's Section 8 program application dated February 21, 2019,

4

and while there is a handwritten notation that could be the letters "SSI," there is no check in the box indicating that Awnuh's daughter suffers from any disability. ECF No. 1-1 at 11. And there is no indication of any specific income for any of Awnuh's children, including his daughter. *Id.* Awnuh also contends that his daughter attended a secondary school for children with mental-health disabilities. Mem. in Opp'n at 3–4. Again, however, there is no evidence in the record that the PHA knew that Awnuh's daughter attended this school.

The record is also silent as to whether Awnuh's caseworker, Jean Hausladen, knew about his daughter's behavioral and mental-health issues. Awnuh's attorney did not question Hausladen about this subject at her deposition. Instead, Hausladen testified that when Awnuh arrived for his recertification appointment, she told him that the appointment would need to be rescheduled because he had not requested an interpreter. Holmes Aff., Ex. B at 13 [ECF No. 43-1 at 20–51]. Awnuh insisted on going forward with the appointment, telling Hausladen that he wanted to use his adult daughter as his interpreter. *Id.* Although Hausladen does not speak Somali and could not independently determine whether Awnuh's daughter was interpreting the meeting correctly, she testified that in her experience if she believes an individual is not understanding the conversation, she will cancel the meeting and reschedule it with a formal interpreter. *Id.* at 15–16. Hausladen further testified that when she "said something [Awnuh] wasn't understanding, [his daughter] would rephrase it in Somali," so she trusted that the daughter was accurately interpreting the meeting. *Id.* at 17.

Awnuh completed his recertification forms at the appointment with Hausladen. Mitchell Aff., Ex. A at 2. The record does not reflect whether Hausladen discussed Awnuh's outstanding obligation to the PHA from his summer 2018 employment at the recertification appointment. Two days after the appointment, Hausladen sent Awnuh a letter informing him that the PHA could not process his recertification due to that outstanding obligation. Mitchell Aff., Ex. L [ECF No. 18 at 18]. The letter also informed Awnuh that if he did not pay the $1,198 by March 15, his rental assistance would be terminated. *Id.* The record does not indicate whether an interpreter insert was enclosed with the letter. Awnuh did not make any payments.

On March 21, Hausladen again wrote to Awnuh informing him that his rental assistance would be terminated as of April 30, 2019, based on his failure to pay the balance owed and his failure to report income changes within ten days. Mitchell Aff., Ex. M [ECF No. 18 at 19–20]. The letter also informed Awnuh that he could contest the termination by submitting a written request for an informal hearing within ten working days of the date of the letter. *Id.* The letter indicated that an interpreter insert was attached to the letter. *Id.* Hausladen also sent a written notification of the impending termination to Awnuh's landlord. *Id.*, Ex. N [ECF No. 18 at 21].

On March 29, Awnuh submitted a Section 8 Change Request form to which he attached a statement from his landlord showing an amount owed but provided no additional information and made no requests. *Id.*, Ex. O [ECF No. 18 at 22–23]. Three days later, Awnuh's teenaged son submitted another Section 8 Change Request form and attached

6

money order stubs dated March 1, 2019, totaling $1,200, but again Awnuh provided no additional information and did not make any requests. *Id.*, Ex. P [ECF No. 18 at 24–26].

The ten-day period within which to request a hearing expired on April 4. On that day, Hausladen sent Awnuh a letter inquiring about his purpose for submitting the statement from his landlord. *Id.*, Ex. Q [ECF No. 18 at 27]. Hausladen attached documents showing the PHA's September 2018 rent adjustment and Awnuh's outstanding balance as well as an interpreter insert. *Id.* On April 9, Hausladen left a voicemail message for Awnuh inquiring about Awnuh's purpose for submitting the money order stubs. *Id.*, Ex. P. There is nothing in the record indicating that any further communication occurred between Awnuh and the PHA in April 2019. The PHA terminated Awnuh's participation in the Section 8 program on April 30, and his family's voucher was reassigned to a family on the waiting list. Mitchell Aff. ¶ 24.

Awnuh's Complaint claims a violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(b). Specifically, Awnuh asserts that the PHA's "refusal to provide meaningful language access services or a hearing despite [Awnuh]'s communications" violated the FHA. Compl. ¶ 59. He also raises a claim under the Fourteenth Amendment's Due Process Clause, alleging that he had a property right in his Section 8 voucher and the PHA unconstitutionally terminated his voucher "without affording him proper notice of its decision or any opportunity for a pre-termination hearing." *Id.* ¶ 67. Awnuh sought a preliminary injunction shortly after filing his Complaint. ECF No. 7. The motion was denied on December 3, 2019, based in part on a finding that Awnuh was not likely to succeed on the merits of his claims. ECF No. 21. Discovery is now complete. The PHA

7

moves for summary judgment, arguing that there are no genuine issues of material fact to be resolved on Awnuh's claims. ECF No. 37. The PHA also seeks exclusion of the opinions of Awnuh's expert witness, Dr. Claire Halpert. *Id.*

II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution "might affect the outcome of the suit" under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

A

The FHA prohibits "discriminat[ion] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). Discrimination under the FHA includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Id.* § 3604(f)(3)(B). This provision encompasses individual claims for disparate treatment as well as claims of disparate impact. At the hearing on this motion,

counsel indicated that Awnuh raises only a disparate-impact claim under the FHA, explicitly abandoning the disparate-treatment claim pled in his Complaint.

The Court previously noted that Awnuh did not plead a disparate-impact claim in his Complaint. ECF No. 21 at 13–14. The Complaint's allegations are confined to the effect the PHA's policies and practices had on Awnuh alone. He did not attempt to amend his pleadings to include such a claim, and the time to do so has long passed. It is procedurally improper to raise a claim on summary judgment that was not raised in the pleadings. *Rodgers v. City of Des Moines*, 435 F.3d 904, 910 (8th Cir. 2006) (finding that "the district court properly refused to consider unpled allegations" on a motion for summary judgment). The PHA's motion for summary judgment, insofar as it concerns Awnuh's disparate-impact claim under the FHA, is granted on this basis alone.

Even if Awnuh had pled a disparate-impact claim, he has not provided evidence to support such a claim. An FHA disparate-impact claim requires Awnuh to demonstrate that a facially neutral policy or practice either has or can be expected to have "a significant adverse impact on members of a protected minority group." *Oti Kaga, Inc. v. S.D. Hous. Dev. Auth.*, 342 F.3d 871, 883 (8th Cir. 2003). If Awnuh succeeds in establishing an adverse impact, the burden shifts to the PHA "to demonstrate that its policy had a 'manifest relationship' to a legitimate, non discriminatory policy objective and was necessary to the attainment of that objective." *Gallagher v. Magner*, 619 F.3d 823, 834 (8th Cir. 2010) (quoting *Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.*, 417 F.3d 898, 902 (8th Cir. 2005)). If the PHA successfully makes this showing, the burden shifts back to Awnuh

to show that a "viable alternative means" is available to achieve the policy objectives without discriminatory effects. *Id.*

There seems to be no dispute that the PHA's practices and the LEP policy are facially neutral. Awnuh claims that they nevertheless have an adverse impact on immigrants who are less likely to speak English and who are more likely to be illiterate in any language than other populations. *See* Mem. in Opp'n at 13 ("Any such similarly situated immigrant would face the same disparate impact."). Awnuh argues that the LEP policy is discriminatory because it requires LEP individuals to request interpreter assistance. He also asserts that the PHA's policy of communicating with LEP individuals in writing using only a "language block"—a standard form that tells LEP individuals in their native language that they should contact the PHA if they are unable to read the document—likewise has an adverse impact on illiterate LEP individuals. *Id.* at 14. Finally, he challenges the PHA's failure to provide interpreter services at its front desk for individuals who might stop by the PHA's offices with forms, as Awnuh did. *Id.* at 16–17.

Awnuh has no evidence of discriminatory impact. He relies on Dr. Halpert's report, which states that the PHA's use of language blocks and the LEP policy's requirement that an LEP individual request an interpreter "put the onus on non-English speakers," which is "even more burdensome for those who are not literate in any language." ECF No. 40-1 at 28. But Dr. Halpert's unsupported belief that the policy is "burdensome" is not proof that the policy has a discriminatory impact. Awnuh has not, for example, come forward with other instances in which illiterate individuals were unable to effectively exercise their rights in response to the PHA's communications.

Awnuh's only other evidence of an alleged disparate impact consists of scholarly works not included in the record. He first points to a 2013 article from the Migration Policy Institute for the proposition that "the vast majority of people living in the United States who cannot speak English at more than the most basic level are immigrants." Mem. in Opp'n at 12 (citing Jie Zong, *et al.*, *The Limited English Proficient Population in the United States in 2013*, Migration Policy Inst. (July 8, 2015) (available at https://www.migrationpolicy.org/article/limited-english-proficient-population-united-states-2013 (last visited Dec. 1, 2020))). This article does not purport to study individuals who cannot speak English at more than the most basic level, defining as Limited-English Proficient "any person age 5 and older who reported speaking English less than 'very well' as classified by the U.S. Census Bureau." *Id.* The article also notes the self-evident proposition that the country's "foreign-born population was much more likely to have limited English proficiency than the native-born population," *id.*, but draws no conclusions from that statement. This article does not support Awnuh's disparate-impact theory.

Awnuh also cites a 2013 report from the Organization for Economic Cooperation and Development as support for his statement that "the vast majority of people living in [the] United States who cannot read or write in any language are immigrants." Mem. in Opp'n at 13 (citing OECD Skills Outlook 2013: First Results from the Survey of Adult Skills (2013) at 127 (available at https://www.oecd-ilibrary.org/education/oecd-skills-outlook-2013_9789264204256-en (last visited Dec. 1, 2020))). This report evaluated literacy rates of native- and foreign-born individuals in countries around the world, ultimately finding that "the average difference in score between native- and foreign-born

11

adults is about 29 points on the literacy scale." *Id.* The report did not purport to examine literacy in any language, and thus does not support Awnuh's claim regarding illiterate immigrants.

But even accepting Awnuh's premise that some portion of the immigrant population of St. Paul is unable to read or write in any language, such a premise is not evidence that the PHA's LEP policies and practices have a disparate impact on that illiterate immigrant population. Other than his own experience, Awnuh provides no evidence regarding other LEP individuals in Section 8 housing. For example, he cites no studies of the impact of those policies; he does not offer even anecdotal evidence regarding the experiences of other illiterate LEP individuals, either with the PHA or other government agencies using similar LEP policies and practices. At this stage, it is his burden to come forward with evidence that could lead a reasonable factfinder to find in his favor. He has failed to do so.

Finally, even if Awnuh could demonstrate a disparate impact, his claim fails at the final stage of the court's analysis, because he cannot show that there are "viable alternative means" to achieving the policy's goals without the alleged discriminatory effects. *Gallagher v. Magner*, 619 F.3d at 834. He asserts that the PHA should not require LEP individuals to affirmatively request an interpreter, but instead should "flag" these individuals' files and provide an interpreter for any interaction the individual has with the PHA. Mem. in Opp'n at 14–15. He does not explain how a caseworker might determine from year to year whether an LEP individual needs language services or not, or how the caseworker might judge whether an individual has acquired sufficient language skills so that an interpreter is no longer necessary. His suggestion that the PHA provide all LEP

individuals with an interpreter raises troubling questions, such as how the PHA would determine which individuals require interpreter skills and whether all LEP individuals would agree to a stranger being privy to their sensitive personal information. Requiring the PHA to provide an interpreter for every interaction with an LEP individual would undoubtedly be expensive, not to mention time-consuming, and Awnuh has not shown this is a "viable" alternative. Nor does Awnuh specify an alternative mode of communication that would ostensibly provide more access than the PHA's written communications using a language block. In his case, Hausladen attempted to contact him by telephone to discuss the forms he sent the PHA at the end of March 2019, and Awnuh has no evidence that other PHA caseworkers would behave any differently in a similar situation.

Finally, Awnuh contends that the front-desk staff, whom he acknowledges are not part of the Section 8 team, should be trained to provide a hearing-request form to all LEP individuals who come to the office without an interpreter. But requiring staff to provide a form that the LEP individual might not need or want does not solve the issue Awnuh complains about, which is lack of English-language access. At the hearing on this motion, Awnuh stated his belief that the front desk could use a telephone-based interpreter service that might not be overly costly. It is Awnuh's burden to demonstrate viable alternatives, not to merely make speculative suggestions. Awnuh has failed to establish the elements of a disparate-impact claim.

B

Awnuh also claims that the PHA violated his Fourteenth Amendment due-process rights in violation of 42 U.S.C. § 1983. Due process requires a government-assistance

recipient to "have timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally." *Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970). A benefit recipient must be offered a pre-termination hearing before welfare benefits can be terminated. *Id.* The Section 8 regulations likewise provide for a notice of termination that contains "a brief statement of reasons for the decision" as well as information regarding the participant's right to request a hearing to contest the termination decision and the deadline for making such a request. 24 C.F.R. § 982.555(a)(1)(iv), (a)(2), (c)(2). No court, either in this district or otherwise, has determined that this procedure is contrary to due process. *See Jones v. Pub. Hous. Agency of City of Saint Paul*, No. 17-cv-5448 (MJD/DTS), 2018 WL 5084842, at *2 (D. Minn. Oct. 18, 2018) (citing cases).

The provision of due-process rights "must be tailored to the capacities and circumstances of those who are to be heard." *Goldberg*, 397 U.S. at 268–69. Awnuh argues that due process requires the PHA to hold a hearing before terminating any participant's Section 8 benefits, whether they request a hearing or not. According to Awnuh, the "criticalness of th[e] basic need [for affordable housing] outweighs the State's competing interest in summary adjudication" of a participant's eligibility for that housing. Mem. in Opp'n at 19 (citing *Basco v. Machin*, 514 F.3d 1177, 1182 n.7 (11th Cir. 2008)).[1]

---

[1] *Basco*'s holding was overruled in *Yarbrough v. Decatur Housing Authority*, 931 F.3d 1322 (11th Cir. 2019). *Yarbrough* determined that there was no cause of action under 42 U.S.C. § 1983 for "suits alleging wrongful termination of housing benefits under the [FHA] where the housing authority failed to prove its case for termination by a

14

In *Basco*, however, the issue was not whether the Section 8 participant was entitled to a hearing—she both requested and received a pre-termination hearing—but rather whether the hearing officer erred by relying on hearsay evidence to make the violation determination. 514 F.3d at 1181. Although noting that *Goldberg* found that a benefit-recipient's interest in her benefits "outweighed the State's competing interest in summary adjudication," *id.* at 1182 n.7, the court did not hold, or have reason to address, whether a public benefits provider is required to hold a hearing whenever it intends to terminate benefits. Awnuh offers no legal authority to support that broad reading of *Goldberg*.

Due process requires notice and an opportunity to be heard. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.") (quotation omitted). "Courts have consistently held that in the context of terminating Section 8 assistance, due process requires that a participant receive notice of the legal basis for termination and an explanation of the facts giving rise to the termination." *Jones*, 2018 WL 5084842, at *2. When evaluating whether due process requires a hearing in every Section 8 termination-of-benefits situation, the court must consider not only Awnuh's interest in housing assistance, but the PHA's interest, including "the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. Although there is no question that Awnuh's need for

---

preponderance of the evidence." *Id.* at 1323. Neither *Basco* nor *Yarbrough* addressed whether a housing authority is required to hold a pre-termination hearing in some or all situations.

housing is critical, forcing the PHA to hold a hearing in every termination case is both unworkable and costly. The administrative burden of forcing each recipient to participate in a pre-termination hearing indisputably outweighs Awnuh's interest here.

Awnuh also argues that the PHA violated due process in his case because it did not honor his attempts to request a hearing. Mem. in Opp'n at 20. But there is no evidence in the record that the PHA's failure to recognize Awnuh's submissions as a request for a hearing was in any way purposeful or discriminatory. Indeed, Ms. Hausladen called Awnuh to try to ascertain why he submitted the documents with money-order stubs, and he did not respond to her message. The PHA did not violate Awnuh's due-process rights in this regard.

Finally, Awnuh asserts that the PHA violated his due-process rights by not recognizing that his limited English proficiency prevented him from understanding what the PHA alleged he did wrong. *Id.* at 20–21. He seems to contend that the PHA should have provided something more than its usual notice of violation and notice of the right to request a hearing because it should have known that he was illiterate in any language. This argument is similar to the disparate-impact argument discussed above: Awnuh contends that because his country of origin only recently developed a written language, the PHA knew or should have known that he was illiterate in any language and should have informed him orally in his native language about the reasons for the termination and his hearing rights.

At bottom, Awnuh's contention is that, if a Section 8 recipient is from a country with no written language or only a recent history of written language, the PHA should

know that the recipient likely will not understand its written communications and should not only force that recipient to use an interpreter, but should attempt to contact the recipient by telephone and should also automatically schedule a pre-termination hearing, whether the recipient requests such a hearing or not. Awnuh does not explain how the PHA should evaluate each recipient's language skills and whether the recipient's written native language is of such recent origin to give rise to this ostensible duty. Awnuh has no legal support for his contentions in this regard. And the remedy he seeks could itself be discriminatory in its assumptions about immigrants and their English proficiency and literacy. Awnuh has failed to establish a violation of his due-process rights, and summary judgment is appropriate on this claim.[2]

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED THAT** Defendant Public Housing Agency of the City of St. Paul's Motion for Summary Judgment [ECF No. 37] is **GRANTED** and the Motion to Exclude Expert Testimony [ECF No. 37] is **DENIED as moot**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: December 1, 2020
s/ Eric C. Tostrud
Eric C. Tostrud
United States District Court

---

[2] Having determined that judgment for the PHA is appropriate on Awnuh's claims, the PHA's motion to exclude the testimony of Awnuh's expert witness, Dr. Claire Halpert, will be denied as moot.